Robert V. Prongay (SBN 270796)
*rprongay@glancylaw.com*
Leanne H. Solish (SBN 280297)
*lsolish@glancylaw.com*
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiffs and Lead Counsel*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RICK GREEN AND EVGENIA NIKITINA, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MAISON SOLUTIONS INC., JOHN XU, ALEXANDRIA M. LOPEZ, TAO HAN, BIN WANG, MARK WILLIS, XIAOXIA ZHANG, JOSEPH STONE CAPITAL, LLC, and AC SUNSHINE SECURITIES LLC,<br><br>Defendants. | Case No. 2:24-cv-00063-SPG(KS)<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW ..... 1

II. JURISDICTION AND VENUE ..... 3

III. CLASS ACTION ALLEGATIONS ..... 4

IV. PARTIES ..... 6

A. Plaintiffs ..... 6

B. Corporate Defendant ..... 7

C. Individual Defendants ..... 7

D. Underwriter Defendants ..... 9

V. SUBSTANTIVE ALLEGATIONS ..... 10

A. Background Of Maison And Its Business ..... 10

B. Maison's IPO ..... 11

C. Maison's Private Placement ..... 12

D. Defendant Xu Retains Tight Control Over Maison And Its Operations ..... 13

E. Just Two Months After The IPO, Hindenburg Reveals "Multiple Red Flags" With The Company ..... 14

F. Defendant Xu And Maison Monterey Park Are The Subject Of An Ongoing Lawsuit Concerning Immigrant Visa Fraud ..... 16

G. Defendant Xu Had Common Control And/Or Significant Influence Over Entities That Transacted With Maison ..... 20

H. SEC Regulations And Guidance, GAAP, And Maison's Own Accounting Policies Required Maison To Report Its Related Party Transactions And The Zang Action To Investors ..... 22

VI. ALLEGATIONS RELEVANT TO THE SECURITIES ACT CLAIMS ..... 27

A. False And Misleading Statements And Omissions In The IPO Registration Statement Relating To Litigation ..... 28

B. False And Misleading Statements And Omissions In The IPO Registration Statement Relating To Related Party Transactions..........31

VII. ALLEGATIONS RELEVANT TO THE EXCHANGE ACT CLAIMS .......40

A. False And Misleading Statements And Omissions Issued During the Class Period..........40

1. False And Misleading Statements And Omissions In Maison's IPO Registration Statement ..........40

2. False And Misleading Statements And Omissions In Maison's Selling Shareholders Registration Statement ..........42

B. Loss Causation ..........45

C. Additional Allegations Regarding Defendants' Scienter ..........46

1. Defendants' Knowledge Of The Zang Action, Its Serious Allegations Of Immigration Fraud, And Its Admitted Material Risk To The Company And Its Business Prospects..........46

2. Corporate Scienter Allegations..........49

D. Applicability Of The Presumption Of Reliance (Fraud-On-The-Market Doctrine) ..........49

VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE..........51

IX. CLAIMS FOR RELIEF..........52

X. PRAYER FOR RELIEF ..........60

XI. JURY TRIAL DEMANDED ..........61

Lead Plaintiffs Migwang Jeong, Yun Jung Kim, Yousub Jun, Lee Sun-Bok, and Hyeonnam Gang ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Maison Solutions Inc. ("Maison" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by Maison; and (c) review of other publicly available information.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Maison shares of Class A common stock (a) pursuant and/or traceable to the registration statement and prospectus (collectively, the "IPO Registration Statement") issued in connection with the Company's October 2023 initial public offering ("IPO"); and/or (b) between October 5, 2023 and December 15, 2023, inclusive (the "Class Period"). Plaintiffs pursue claims under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2. Maison is a specialty grocery retailer offering Asian food and merchandise to U.S. consumers. At the time of the IPO and throughout the Class Period, Maison owned equity interests in six Los Angeles-area grocery stores branded "HK Good Fortune Supermarket" or "Hong Kong Supermarket." Maison is largely run and controlled by its CEO, President, and Chairman of the board of directors, Defendant John Xu ("Xu").

3. On October 5, 2023, the Company filed its prospectus with the SEC, which forms part of the IPO Registration Statement. In the IPO, the Company sold 2,500,000 shares of Class A common stock at a price of $4.00 per share. From the

IPO, the Company received net proceeds of approximately $8.72 million after deducting underwriting discounts and commissions and estimated IPO offering expenses payable by the Company. Maison stated that the proceeds from the IPO were to be used for new store acquisitions and expansion, including opening new stores and the acquisition of businesses and supermarkets that complement Maison's business.

4. In the two months following Maison's IPO, the Company's stock quickly shot up in price, closing at an all-time high of $15.21 per share of Class A common stock on December 14, 2023.

5. On December 15, 2023, Hindenburg Research ("Hindenburg") made a series of posts about Maison on the social media platform X, formerly known as Twitter, concluding that "[b]eyond [Maison's] valuation, we found multiple red flags" with the Company. Specifically, Hindenburg, through an analysis of Los Angeles Superior Court filings, uncovered that a Hong Kong Supermarket, Defendant Xu, and a one of Xu's other businesses, J&C International Group ("J&C"), were named as defendants in a lawsuit and were allegedly using "supermarkets as a front to defraud the EB-5 visa program." Hindenburg also posted that it believed, based on its investigation, that Maison was not disclosing related party transactions.

6. Upon the posting of Hindenburg's findings, the price of Maison's Class A common stock fell 83.6%, or $12.71 per share, to close at just $2.50 per share on December 15, 2023, on unusually heavy trading volume.

7. Maison's stock price has never recovered. On October 20, 2025, Maison's stock price closed at just $0.70, an 82.5% decline from the $4 per share IPO price, and a more than 95% decline from Maison's all-time high of $15.21 per share at closing on December 14, 2023.

8. In the IPO Registration Statement and during the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, Defendants failed to disclose to investors: (1) the pendency of litigation in which Defendant Xu's actions relating to Maison's supermarkets, and specifically the Monterey Park location, are key subjects in ongoing litigation; and (2) that Maison entered into transactions with undisclosed related parties.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§77k and 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. §77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

12. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A significant portion of the Defendants' actions, and the subsequent damages took place within this District. Defendants conducted the IPO in this District, disseminated the IPO and Selling Shareholders Registration Statements (as defined below) into this District, and Defendants solicited purchasers of shares of Maison Class A common stock in this District. The Underwriter Defendants (as defined below) also have substantial operations and/or conduct substantial business in this District (directly or via agents) and represented Maison and all or some of the other defendants in carrying out the IPO. In addition, substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of

materially false and/or misleading information, occurred in substantial part in this Judicial District. The Company's principal executive offices are also in this District.

13. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. CLASS ACTION ALLEGATIONS

14. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired shares of Maison Class A common stock: (a) pursuant and/or traceable to the IPO Registration Statement issued in connection with the Company's IPO, seeking to pursue remedies under the Securities Act; and/or (b) during the Class Period, October 5, 2023 and December 15, 2023, inclusive, seeking to pursue remedies under the Exchange Act (collectively, the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, the persons and/or entities that purchased or otherwise acquired shares of Maison Class A common stock in the private placement announced by the Company on November 22, 2023, and any entity in which Defendants have or had a controlling interest.

15. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. The Company sold 2,500,000 shares of Class A common stock in the IPO. Tens of thousands of shares of Maison Class A common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Maison or its transfer agent and may

be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

18. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether the IPO Registration Statement, statements made by Defendants to the investing public in connection with the Company's IPO, and statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Maison; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

19. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

# IV. PARTIES

## A. Plaintiffs

20. Lead Plaintiff Migwang Jeong, as set forth in the previously filed certification (ECF No. 18-5) incorporated by reference herein, purchased or otherwise acquired shares of Maison Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO during the Class Period and was damaged thereby.

21. Lead Plaintiff Yun Jung Kim, as set forth in the previously filed certification (ECF No. 18-5) incorporated by reference herein, purchased or otherwise acquired shares of Maison Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO during the Class Period and was damaged thereby.

22. Lead Plaintiff Yousub Jun, as set forth in the previously filed certification (ECF No. 18-5) incorporated by reference herein, purchased or otherwise acquired shares of Maison Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO during the Class Period and was damaged thereby.

23. Lead Plaintiff Lee Sun-Bok, as set forth in the previously filed certification (ECF No. 18-5) incorporated by reference herein, purchased or otherwise acquired shares of Maison Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO during the Class Period and was damaged thereby.

24. Lead Plaintiff Hyeonnam Gang, as set forth in the previously filed certification (ECF No. 18-5) incorporated by reference herein, purchased or otherwise acquired shares of Maison Class A common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO during the Class Period and was damaged thereby.

**B. Corporate Defendant**

25. Defendant Maison is incorporated under the laws of Delaware with its principal executive offices at 127 N. Garfield Avenue, Monterey Park, California, 91754. Following the IPO, Maison's Class A common stock trades on the Nasdaq Capital Market ("NASDAQ") under the symbol "MSS."

**C. Individual Defendants**

26. Defendant John Xu ("Xu") has served as a director, President, and Chief Executive Officer ("CEO") of Maison since 2019. He also serves as the Chairman of Maison's Board of Directors. Defendant Xu has served as Director and President of J&C International Group LLC ("J&C"), a cross-border investment firm since 2013. From 2009 to 2020, Defendant Xu served as Director and President of Ideal City Realty, LLC, a real estate investment firm. Defendant Xu also goes by the names Jun Xu and John Jun Xu. Defendant Xu signed or authorized the signing of the Company's IPO Registration Statement and Selling Shareholders Registration Statement filed with the SEC.

27. Defendant Alexandria M. Lopez ("Lopez") has served as a director and Chief Financial Officer ("CFO") of Maison since 2019. Defendant Lopez has also served as CFO of J&C from 2014 through 2023. Defendant Lopez signed or authorized the signing on her behalf of the Company's IPO Registration Statement and Selling Shareholders Registration Statement filed with the SEC.

28. Defendants Xu and Lopez signed or authorized the signing of the IPO Registration Statement and the Selling Shareholders Registration Statement, solicited the investing public to purchase or otherwise acquire shares of Class A common stock issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO, the IPO Registration Statement, the Selling Shareholders Registration Statement, and promotions to meet with and present favorable information to potential Maison investors, all motivated by their own and the Company's financial interests.

29. In addition, Defendants Xu and Lopez, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendants Xu and Lopez were provided with copies of the Company's filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, Defendants Xu and Lopez knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. Defendants Xu and Lopez are liable for the false and misleading statements and omissions pleaded herein.

30. Defendant Tao Han ("Han") served as Maison's Chief Operating Officer ("COO") effective upon completion of the IPO until his resignation on or around February 21, 2025. Defendant Han signed or authorized the signing on his behalf of the Company's IPO Registration Statement filed with the SEC.

31. Defendant Bin Wang ("Wang") has been a director of Maison since the IPO in October 2023. Defendant Wang signed or authorized the signing on his behalf of the IPO Registration Statement filed with the SEC as a "director nominee."

32. Defendant Mark Willis ("Willis") has been a director of Maison since the IPO in October 2023. Defendant Willis signed or authorized the signing on his behalf of the IPO Registration Statement filed with the SEC as a "director nominee."

33. Defendant Xiaoxia Zhang ("Zhang") has been a director of Maison since the IPO in October 2023. Defendant Zhang signed or authorized the signing on her behalf of the IPO Registration Statement filed with the SEC as a "director nominee."

34. Defendants Xu, Lopez, Han, Wang, Willis, and Zhang are collectively referred to herein as the "Individual Defendants."

**D. Underwriter Defendants**

35. Defendant Joseph Stone Capital, LLC ("Joseph Stone") acted as an underwriter for the Company's IPO, helping to draft and disseminate the IPO documents. Joseph Stone acted as lead underwriter for the IPO. In the IPO, Joseph Stone agreed to purchase and resold to Class Members 2,000,000 shares of the Company's Class A common stock, exclusive of the over-allotment option.

36. Defendant AC Sunshine Securities LLC ("AC Sunshine") acted as an underwriter for the Company's IPO, helping to draft and disseminate the IPO documents. In the IPO, Joseph Stone agreed to purchase and resold to Class Members 500,000 shares of the Company's Class A common stock, exclusive of the over-allotment option.

37. Defendants Joseph Stone and AC Sunshine are collectively referred to hereinafter as the "Underwriter Defendants."

38. In total, based on the underwriting discount of $0.27 per share of Class A common stock to be paid from Maison to the underwriters in the IPO, the Underwriter Defendants collectively received approximately $675,000 in connection with the IPO. In addition, Maison issued the Underwriter Defendants non-redeemable warrants to purchase an amount equal to five percent (5%) of the shares of Class A common stock sold in the IPO, exercisable, in whole or in part, six (6) months after the closing of the IPO and expiring five years thereafter.

39. The Underwriter Defendants participated in drafting and disseminating the Registration Statement, soliciting investors for the IPO, and marketing and pricing the IPO. The Underwriter Defendants failed to conduct adequate due diligence in connection with the IPO and were negligent in failing to ensure that the Registration Statement was prepared accurately and in accordance with the rules and regulations governing their preparation. The Underwriter Defendants' negligence was a substantial factor leading to the harm complained of herein.

40. Maison, the Individual Defendants, and the Underwriter Defendants are referred to collectively as "Defendants."

## V. SUBSTANTIVE ALLEGATIONS

### A. Background Of Maison And Its Business

41. Maison describes itself as a "fast-growing, specialty grocery retailer offering traditional Asian food and merchandise to modern U.S. consumers, in particular to members of Asian-American communities." At the time of the IPO and during the Class Period, Maison owned majority interests in four supermarkets and minority interests in two additional supermarkets in the San Gabriel Valley of Los Angeles County, California. The Company was formed in July 2019 as Maison International, Inc. In September 2021, the Company was renamed Maison Solutions Inc.

42. In July and October 2019, Maison acquired majority equity interests in its first three traditional retail Asian supermarkets with two brand names, Good Fortune and Hong Kong Supermarkets, in San Gabriel, Monrovia, and El Monte, California. Maison then rebranded these grocery stores as "HK Good Fortune Supermarkets" or "Hong Kong Supermarkets." On June 30, 2022, Maison acquired a 100% equity interest in a fourth supermarket in Monterey Park, CA.

43. In December 2021, Maison acquired a 10% interest in a HK Good Fortune supermarket in Alhambra, California. On June 27, 2023, Maison acquired a 40% interest in a HK Good Fortune supermarket in Arcadia, California and acquired another 10% on December 6, 2023, which was later revised downward to a total equity interest of 49% on February 1, 2024. In addition, in May 2021, Maison acquired a 10% interest in a wholesale business, Dai Cheong, which mainly supplies food and groceries imported from Asia.

44. As part of the IPO, Maison explained that it plans to acquire additional supermarkets to expand the Company's footprint on both the West and East Coasts. In 2024, Maison announced plans to open a flagship store in the San Gabriel Valley,

specifically in Rowland Heights, California, and that it had acquired a three-store supermarket chain in the Phoenix and Tucson, Arizona metropolitan areas. In June 2025, Maison announced the closure of its El Monte supermarket, and a review of the Company's website shows that no store has opened in Rowland Heights.

**B. Maison's IPO**

45. On or about May 22, 2023, Maison filed with the SEC its registration statement on Form S-1, which would later be utilized in the IPO following multiple amendments on Form S-1/A, the last of which was filed on June 14, 2023, and declared effective by the SEC later on June 14, 2023. After the registration statement was declared effective, Maison filed multiple post-effective amendments on Form POS AM, the last of which was filed on September 13, 2023, and declared effective by the SEC on September 29, 2023.

46. On October 4, 2023, Maison announced the pricing of the IPO at $4.00 per share of Class A common stock. Then, on October 5, 2023, Maison filed with the SEC the final prospectus dated October 4, 2023 for the IPO (the "IPO Prospectus"), which forms part of the registration statement (the IPO Prospectus and the Form S-1 together with all amendments and post-effective amendments thereto, are collectively referred to as the "IPO Registration Statement").

47. On October 5, 2023, Maison Class A common stock began trading on the NASDAQ, with the ticker symbol "MSS."[1]

48. On October 10, 2023, Maison announced the closing of its IPO of 2,500,000 shares of its Class A common stock at a price of $4.00 per share. As part of the IPO, Maison received $10 million in gross proceeds and net proceeds of

[1] As part of the IPO, Maison, its executive officers, directors, and existing beneficial owners of 5% of greater of the outstanding Maison Class A common stock were subject to a twelve month lock up provision, pursuant to which they could not trade their shares of Maison Class A common stock, except with the prior written consent of the underwriter.

approximately $8.72 million after deducting underwriting discounts and commissions and estimated IPO offering expenses payable by the Company. Maison stated in its IPO Prospectus that it intended to use the net proceeds from the IPO to acquire the remaining 90% equity interests in the Alhambra store and in Dai Cheong, to open new stores, to repay loans, and, with any remaining balance of the net proceeds, to use for general corporate purposes.

**C. Maison's Private Placement**

49. Not long after the closing of the IPO, on November 22, 2023, Maison announced the closing of a private placement of 1,190,476 shares of Class A common stock at $4.20 per share for gross proceeds of approximately $5 million and net proceeds of $4.6 million. These shares were sold to two non-U.S. persons. In connection with the private placement offering, Maison agreed to provide for the registration of the resale of these shares pursuant to a registration statement on Form S-1 to be filed with the SEC.

50. In accordance with that agreement, on or about November 29, 2023, Maison filed with the SEC its registration statement on Form S-1 for the sale of up to 1,190,476 shares of Class A common stock by certain selling shareholders from time to time, and which was declared effective by the SEC December 6, 2023. On December 11, 2023, Maison filed with the SEC the prospectus dated December 6, 2023 (the "Selling Shareholders Prospectus"), which forms part of the registration statement (the Selling Shareholders Prospectus and the Form S-1 together are collectively referred to as the "Selling Shareholders Registration Statement").

51. Maison agreed to keep the Selling Shareholders Registration Statement continuously effective for either one year from the effective date, or if earlier, the date that all of the 1.19 million shares are sold.

### D. Defendant Xu Retains Tight Control Over Maison And Its Operations

52. Maison admits that it is a "Controlled Company" as defined by the NASDAQ, because Defendant Xu holds more than 50% of the Company's voting power. The 2,500,000 shares of Class A common stock sold in the IPO represented approximately just 15.4% of Maison's 16.26 million shares of Class A common stock outstanding after the closing of the IPO. Defendant Xu, however, was the beneficial owner of 13.6 million shares of Class A common stock, approximately 83.6% of the outstanding shares of Class A common stock after the closing of the IPO.

53. Defendant Xu also owns 100% of Maison's outstanding shares of Class B common stock. Maison's dual class structure affords class "B" shares ten votes per share, compared to one vote per share afforded to class "A" shares. Collectively, this gave Defendant Xu control of 93.12% of the voting rights of the Company following the IPO. In the IPO Registration Statement, Maison explained that with this voting power, Defendant Xu "will have the ability to control the outcome of matters submitted to our stockholders for approval, including the election of our directors, as well as the overall management and direction of our company."

54. One way that Defendant Xu has displayed his tight control and management over Maison is through multiple transactions between Maison and: (1) himself; (2) his wife, Grace Xu; and (3) companies owned by Defendant Xu. For example, in the IPO Registration Statement, Maison admits that prior to the IPO, Maison collectively borrowed at least $2.3 million, that was later repaid, from Defendant Xu, Grace Xu, and companies owned by Defendant Xu. Similarly, Maison collectively lent at least $565,000, which was later repaid, to companies owned by Defendant Xu. In addition, as of July 31, 2023, the Company currently collectively owes Defendant Xu and Grace Xu $241,585, and companies owned by Defendant Xu collectively owe Maison $33,995.

55. The IPO and Selling Shareholder Registration Statements also detail a number of equity transactions and/or acquisitions between Grace Xu and companies owned by Defendant Xu, including: (1) the sale of 25% equity interest of Hong Kong Supermarket of Monterey Park, Ltd. to HZV Holding Inc., a company owned by Defendant Xu less than two months after Maison acquired the equity interest, and for the same price ($0.66 million); (2) the Company's 10% equity interest of Dai Cheong, which it acquired from DC Holding CA, Inc., a corporation owned by Defendant Xu; (3) the Company's 10% equity interest of HKGF Market of Alhambra, Inc., the legal entity holding the Alhambra Store, from Grace Xu; and (4) the acquisition of the Monterey Park supermarket from an entity that was 49% owned by Grace Xu, and which, less than one year after its acquisition, Maison renegotiated the purchase price to be $1 million greater than the original purchase price.

56. Further, the IPO Registration Statement states that the net proceeds from the IPO will be used to purchase the remaining 90% equity interest of the Alhambra store from Grace Xu, as well as purchasing the remaining 90% interest of Dai Cheong from DC Holding CA, Inc., which is owned by Defendant Xu. Although Maison did not state what the purchase price would be for these 90% equity interests, it did state in the IPO Registration Statement that Maison would pay off the loans from the U.S. Small Business Administration "held by each entity of approximately $2.0 million and $2.4 million, respectively, as partial consideration for such acquisitions[.]"

### E. Just Two Months After The IPO, Hindenburg Reveals "Multiple Red Flags" With The Company

57. In the two months following Maison's IPO, the Company's stock quickly shot up in price, closing at an all-time high of $15.21 per share of Class A common stock on December 14, 2023.

58. The following day, on December 15, 2023, at approximately 2:30 p.m. Eastern Standard Time, Hindenburg made a series of posts about Maison on the social

media platform X, formerly known as Twitter, detailing the results of Hindenburg's investigation into the Company, concluding that they found "multiple red flags."

59. In its posts, Hindenburg provided detail from an undisclosed lawsuit alleging that that Defendant Xu and his J&C business used the Hong Kong Supermarkets "as a front to defraud the EB-5 visa program." Specifically, Hindenburg posted the following, along with screenshots from the complaint:

> In $MSS IPO prospectus, Chairman, CEO and key holder John Xu is also listed as President of J&C International Group, LLC, "a cross-border investment firm" since 2013. J&C's website says it "support[s] immigration services for high-net-worth Chinese investors and institutions".
>
> * * *
>
> J&C International, $MSS CEO John Xu and related entity Hong Kong Supermarkets were named as defendants in 2020 litigation alleging they used supermarkets as a front to defraud the EB-5 visa program.
>
> * * *
>
> The plaintiff alleged that ***J&C International took a $500k investment in Hong Kong Supermarket from him to help him get his Visa***.
>
> ***He alleged that $MSS CEO John Xu and J&C forged his Visa application, and listed him as a fake employee of a supermarket location now owned by $MSS***.
>
> * * *
>
> The plaintiff alleged that when he asked for copies of his visa application, he was threatened with retaliation by J&C and John Xu.
>
> ***The court found in favor of the plaintiff, and defendants lost an appeal. The case is currently being scheduled for trial.***

60. Hindenburg also posted that, based on its research, it believes that Maison was not disclosing related party transactions.

61. On this news, the price of Maison's Class A common stock fell 83.6%, or $12.71 per share, to close at just $2.50 per share on December 15, 2023, on unusually heavy trading volume.

62. On December 18, 2023, after the end of the Class Period, Maison issued a statement in response to Hindenburg's "short attack" stating, *inter alia*: "The Company believes the December 15, 2023 short attack on Maison Solutions' securities directly reflected a report issued that day by Hindenburg Research that contained inaccurate and misleading statements.... Such reports typically are filled with inuendo and are meant to deceive and frighten investors into selling their shares, creating a panic environment, causing precipitous price declines, and creating great harm to the majority of shareholders. It is our intention to take steps as appropriate regarding this matter for the benefit of all of our stakeholders, as we continue to work diligently to build the Company."

**F. Defendant Xu And Maison Monterey Park Are The Subject Of An Ongoing Lawsuit Concerning Immigrant Visa Fraud**

63. The "2020 litigation" discussed in Hindenburg's posts is a case captioned *Zang v. Xu, et al.*, Case No. 20GDCV00485 (Cal. Super. Ct.), filed on or about June 9, 2020 (the "Zang Action"). The Zang Action names, *inter alia*, Defendant Xu, J&C, and "Hong Kong Supermarket" as defendants, and further that Defendant Xu "was and still is an agent of Hong Kong Supermarket having authority to act on its business."

64. As detailed in the operative second amended complaint filed on October 22, 2020, in September 2018, the plaintiff, Zang, sought services to obtain a U.S. green card through investing in the United States, and was "steered" to a supposed investment opportunity in the Hong Kong Supermarket in Monterey Park. Ex. 1 at ¶22. Maison acquired a 100% equity interest in this particular supermarket on June 30, 2022.

65. Zang was shortly thereafter introduced to Defendant Xu "as the owner of Hong Kong Supermarket," and was told by Defendant Xu that J&C would help Zang to make and manage his investment, and that he would have the right to supervise and manage his investment, as well as work for the company he invested in and receive a salary therefrom. Ex. 1 at ¶24. Zang eventually made a $500,000 "investment" in the Hong Kong Supermarket in Monterey Park by transferring $500,000 to defendant HZV Holding, Inc., pursuant to the attached Service Contract between Zang and J&C. *Id.* at ¶¶25, 27, 112 and Exs. A, D.[2]

66. The operative complaint in the Zang Action also alleges that Zang was told to report to work at the Hong Kong Supermarket in Monterey Park in August 2019 and would be set up there in an executive office. Zang alleges that when he reported to work as instructed at the Hong Kong Supermarket in Monterey Park, he was not advised of any job duties or responsibilities, was told "simply to sit in the executive office during his work hours[,]" and was not given any tasks to perform. Zang further alleges that he was told the following day that "there are other 'executives' [who] do not come in to work at all, and plaintiff could do the same." Ex. 1 at ¶¶38- 40.

67. The operative complaint in the Zang Action further alleges that the foregoing statement evidences that the ***Hong Kong Supermarket in Monterey Park is used by the defendants "as a front for a scheme of immigration fraud***, and as the spurious work location of other purported 'managers' and 'executives' on whose behalf Defendants are preparing and submitting documents to defraud USCIS." *Id.* at ¶40.

---

[2] Zang alleges that Defendant Xu is an officer of HZV Holding, Inc, and Defendant Lopez held herself out to be HZV's CFO. *Id.* at ¶9 and Ex. D. In the IPO Registration Statement, Maison admits that HZV Holding, Inc. is owned by Defendant Xu.

68. Zang alleges that when he met with and questioned Defendant Xu and another named defendant, an agent and employee of J&C, about his "complete lack of job duties" and the failure to provide Zang with his immigration petition and supporting documents, Defendant Xu and the other defendant were evasive and did not provide satisfactory answers to Zang's questions. Zang also alleges that after one month of working at the supermarket, he had not been paid. Ex. 1 at ¶¶4, 41- 42, 107.

69. The Zang Action brought two causes of action against the Hong Kong Supermarket. Ex. 1 at ¶¶108-116. The first cause of action against Hong Kong Supermarket was for violation of the California Business and Professions Code §17200 for unfair business practices. *Id.* Specifically, Zang alleges that:

> ***Defendant Hong Kong Supermarket's business was based on false, misleading and deception tactics***, including but not limited to, ***allowing other Defendants to use its name and goodwill to entice Chinese immigrants***, including Plaintiff, ***for their fraudulent "investment for green card" scheme; and allowing other Defendants access to its facilities and office spaces for the purpose of creating sham employment in furtherance of Defendants' fraudulent immigration petitions to USCIS.***
>
> … Plaintiff is informed and believes and thereon alleges that Defendants Hong Kong Supermarket, J & C International, Meiju Group routinely falsify documents, forge their clients' signatures on documents, prevent their clients from reviewing documents submitted or to be submitted on their behalves, and select and control the attorneys retained to represent their clients and prepare clients' immigration petitions and applications using false documents.…
>
> … Plaintiff is informed and believes and thereon alleges that Defendants operate through sham corporate entities through which they obtain spurious work visas for Chinese nationals by illusory and non-existent "executive" and "managerial" positions which they then present to USCIS as the basis for granting L-1A visas to their clients.

Zang further alleges that "all Defendants other than Hong Kong Supermarket, J & C International, Meiju Group were the agents and employees of Hong Kong Supermarket, J & C International, Meiju Group, and in doing the things herein alleged

were acting within the course and scope of such agency and employment with the permission and consent of their co-defendants." Ex. 1 at ¶109. Zang also alleges an Accounting cause of action against the Hong Kong Supermarket relating to Zang's $500,000 investment in Hong Kong Supermarket's business, and in addition to the accounting, seeks a share of the profit of Zang's "investment." *Id.* at p. 25-26.

70. The defendants in the Zang Action filed special motions to strike the operative complaint in November 2020. Defendant Xu submitted a declaration in support of his motion. The trial court denied these motions, and the defendants appealed. The appellate court affirmed the trial court's denial of the motions in June 2023, and most defendants, including Defendant Xu and defendant Hong Kong Supermarket, answered the operative complaint on September 15, 2023 by generally denying the allegations.

71. Recently, Zang and certain defendants, including Defendant Xu, J&C, and Hong Kong Supermarket conditionally settled the action by agreeing to jointly and severally pay Zang $700,000, pursuant to a payment plan and subject to an equity pledge of two construction projects as security for payment of the total amount. The settling parties also agreed to enter two separate stipulated judgments. One of these stipulated judgments would be a judgment for damages should the settling defendants fail to timely pay Zang pursuant to the agreed payment timeline. The other stipulated judgment was to be a factual statement stipulated to by one of the settling defendants, ZHL Management Inc., which was to be filed immediately so that Zang may use the stipulation of facts in his immigration case.

72. Pursuant to the agreement, Zang and ZHL thereafter entered into a "Stipulation of Facts" and "Confession of Judgment" which the trial court entered on March 24, 2025. In the stipulation, ZHL confessed judgment as to the third cause of action in the operative complaint, "Fraudulent Concealment/Conspiracy/Aiding and Abetting." Ex. 2 at 8. As part of the stipulation, defendant ZHL stipulated to a number of facts alleged in the operative Zang complaint "in response to the USCIS

findings by its Fraud Detection and National Security unit" and which were adopted as factual findings as to defendant ZHL. Ex. 2 at 6, 8. Among the facts stipulated to in this judgment was that: (1) "defendant Hong Kong Supermarket's Monterey Park location was the supermarket business for Zang's investment"; (2) "Hong Kong Supermarket's Monterey Park location was listed in the Service Contract with J&C as the subject matter of Zang's investment"; (3) "Zang was instructed to report for work at Hong Kong Supermarket's Monterey Park location"; (4) "Zang was placed for work in an executive office inside the Hong Kong Supermarket's Monterey Park location without performing any job duties." Ex. 2 at 6.

73. A review of the docket in the Zang Action shows that the case is still currently pending to allow the settling defendants time to submit appropriate documentation for the equity pledge.

### G. Defendant Xu Had Common Control And/Or Significant Influence Over Entities That Transacted With Maison

74. Plaintiffs' independent investigation has confirmed that Defendants failed to disclose transactions with entities which Defendant Xu was affiliated with and thus would have had common control and/or a significant influence.

75. ***Good Fortune Supermarket of San Gabriel, LP*:** Maison disclosed in the IPO and Selling Shareholder Registration Statements that in July 2019, Maison acquired 91% of the equity interests in Good Fortune Supermarket of San Gabriel, LP ("Good Fortune San Gabriel"), "…which owns a HK Good Fortune Supermarket in San Gabriel, California." Defendant Xu, as explained below, was associated with and would have had common control and/or a significant influence over Good Fortune San Gabriel at the time Maison acquired the equity interests of HK Good Fortune San Gabriel.

76. Good Fortune San Gabriel's initial filing with the California Secretary of State was a Certificate of Limited Partnership filed on January 23, 2015. This certificate shows that the entity was originally named JIC 3, LP, that Defendant Xu

was the agent for service of process, and that the general partner was JCW International LLC, of which Defendant Xu was the manager. The address listed for the entity, for service of process, and for JCW International LLC were all 1955 Rose Ave, San Marino, CA 91108—a former address associated with Defendant Xu during this time. Defendant Xu signed this filing in his capacity as Manager of JCW International LLC. Ex. 3 at 1.

77. On October 7, 2015, a Restated Certificate of Limited Partnership was filed with the California Secretary of State. In addition to updating the address to 137 S San Gabriel Blvd, San Gabriel, CA 91776 – the actual address of this store – the name of the limited partnership was changed to Good Fortune Supermarket of San Gabriel, LP, stating that JCW International LLC is a dissociated general partner, and changing the general partner to Good Fortune Supermarket of San Gabriel, Inc, of which Defendant Xu is the COO (chief operating officer). Ex. 3 at 2-3.

78. ***Good Fortune Supermarket of Monrovia, LP*****:** Maison disclosed in the IPO and Selling Shareholder Registration Statements that in July 2019, Maison acquired an 85.25% equity interest in Good Fortune Supermarket of Monrovia, LP (Good Fortune Monrovia"), "…which owns a HK Good Fortune Supermarket in … Monrovia, California." Defendant Xu, as explained below, was associated with and would have had common control and/or a significant influence over Good Fortune Monrovia at the time Maison acquired the equity interests of HK Good Fortune Monrovia.

79. Good Fortune Monrovia's initial filing with the California Secretary of State was a Certificate of Limited Partnership filed on December 20, 2012. This certificate shows that the entity was originally named Hong Kong Supermarket Monrovia, LP, that Defendant Xu was the agent for service of process, and that one of the two general partners was Ideal Investment CA Regional Center, LLC, of which Defendant Xu was the Manager. Defendant Xu signed this filing in his capacity as Manager of Ideal Investment CA Regional Center, LLC. Ex. 3 at 4.

80. Likewise, on October 7, 2015, a Restated Certificate of Limited Partnership was filed with the California Secretary of State, updating the name of the limited partnership to Good Fortune Supermarket of Monrovia, LP. This filing also stated that the only general Partner was Good Fortune Supermarket of Monrovia, Inc., of which Defendant Xu is the COO. Ex. 3 at 5-6. On April 28, 2022, Defendant Xu, as the COO of Good Fortune Supermarket of Monrovia, Inc. filed a dissociation of General Partner CA Limited Partnership. Ex. 3 at 7.

### H. SEC Regulations And Guidance, GAAP, And Maison's Own Accounting Policies Required Maison To Report Its Related Party Transactions And The Zang Action To Investors

81. Related party transactions are self-dealing transactions between a company and those that have significant control over the company's decisions. Although related party transactions can benefit companies, because individuals with decision-making power are on both sides of a related party transaction – here Defendant Xu – there is a potential risk that their power will be used for personal benefits at the expense of a company's interests. As such, disclosure lets investors decide how to evaluate the information themselves.

82. Federal regulations strictly govern what must be included in documents filed with the SEC. SEC Regulation S-X requires that the amounts of related party transactions that affect the registrant's financial statements "shall be set forth on the face of the appropriate statement or in appropriately captioned notes." 17 C.F.R. §210.4-08(a), (k)(1). The SEC defines "related parties" in accordance with the GAAP definition (defined below at ¶90). 17 CFR §210.1-02(u).

83. Item 404 of SEC Regulation S-K requires Maison to describe any transaction during the latest fiscal year, in which Maison "was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest." 17 C.F.R. § 229.404(a). This description must include:

> (1) The name of the related person and the basis on which the person is a related person.
>
> (2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction.
>
> (3) The approximate dollar value of the amount involved in the transaction.
>
> (4) The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss.
>
> (5) In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness.
>
> (6) Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

*Id.*

84. In the instructions to Item 404(a) of Regulation S-K, a related person means, *inter alia*: any director or executive officer of the Company; or any immediate family member of a director or executive officer. *Id.*

85. SEC Release No. 33-8056 instructs that in disclosing transactions with related and certain other parties:

> Statement of Financial Accounting Standards No. 57 (FAS 57), *Related Party Disclosures*, sets forth the requirements under GAAP concerning transactions with related parties. ***As noted in that standard, "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's length basis, as the requisite conditions of competitive, free-market dealings may not exist."*** Accordingly, where

> related party transactions are material, MD&A should include discussion of those transactions to the extent necessary for an understanding of the company's current and prospective financial position and operating results. In addition, Item 404 of Regulation S-K . . . require disclosure of certain relationships and transactions with related parties.
>
> Registrants should consider whether investors would better understand financial statements in many circumstances if MD&A included descriptions of all material transactions involving related persons or entities, with clear discussion of arrangements that may involve transaction terms or other aspects that differ from those which would likely be negotiated with clearly independent parties. Registrants should consider describing the elements of the transactions that are necessary for an understanding of the transactions' business purpose and economic substance, their effects on the financial statements, and the special risks or contingencies arising from these transactions. Discussion of the following may be necessary:
>
> - the business purpose of the arrangement;
> - identification of the related parties transacting business with the registrant;
> - how transaction prices were determined by the parties;
> - if disclosures represent that transactions have been evaluated for fairness, a description of how the evaluation was made; and
> - any ongoing contractual or other commitments as a result of the arrangement.
>
> ***Registrants should also consider the need for disclosure about parties that fall outside the definition of "related parties," but with whom the registrant or its related parties have a relationship that enables the parties to negotiate terms of material transactions that may not be available from other, more clearly independent, parties on an arm's-length basis.*** In some cases, ***investors may be unable to understand the registrant's reported results of operations without a clear explanation of these arrangements and relationships.***

86. In particular, federal regulations required Defendants to comply with United States generally accepted accounting principles ("GAAP"), which are those

principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Specifically, SEC Regulation S-X requires that financial statements as filed with the SEC be prepared in accordance with GAAP. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

87. Maison's IPO and Selling Shareholder Registration Statements violated GAAP, rendering them materially false and misleading.

88. Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.

89. ASC Topic 850, Related Party Disclosures ("ASC 850") explains that "[i]nformation about transactions with related parties that would make a difference in decision making shall be disclosed so that users of financial statements can evaluate their significance. Therefore, this Topic establishes requirements to disclose certain significant related party transactions and control relationships." ASC 850-10-1.

90. ASC 850-10-20 defines a related party to include, *inter alia*: (i) "affiliates of the entity;"(ii) "Principal owners of the entity and members of their immediate families;" (iii) "***Management of the entity*** and members of their immediate families;" (iv) "Other parties with which the entity may deal if one party ***controls or can significantly influence the management or operating policies of the other*** to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests;" and (v) "***Other parties that can significantly influence the management or operating policies of the transacting parties*** or that

have an ***ownership interest in one of the transacting parties and can significantly influence the other*** to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests."

91. ASC 850-50-1 requires that financial statements include disclosures of material related party transactions, including: (a) the nature of the relationship(s) involved; (b) a description of the transactions; (c) the dollar amounts of the transactions for each of the periods in which an income statements is present and "the effects of any change in the method of establishing the terms from that used in the preceding period;" and (d) amounts due from or to related parties as of the date of each balance sheet presented.

92. ASC 850-50-2 requires that "[n]otes or accounts receivable from officers, employees, or affiliated entities ***must be shown separately*** and not included under a general heading such as notes receivable or accounts receivable."

93. ASC 850-50-3 further states that "[i]f necessary to the understanding of the relations, the name of the related party shall be disclosed."

94. In its IPO and Selling Shareholder Registration Statements, Maison listed a summary of significant accounting policies, including its accounting policy for related parties:

> The Company identifies related parties, accounts for, and discloses related party transactions in accordance with ASC Topic 850 "Related Party Disclosures" and other relevant ASC standards. ***Parties are considered to be related to the Company if the parties***, directly or indirectly, through one or more intermediaries, ***control, are controlled by, or are under common control with the Company. Related parties also include*** principal owners of the Company, its management, members of the immediate families of principal owners of the Company and its management and ***other parties with which the Company may deal with if one party controls or can significantly influence the management or operating policies of the other*** to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.

95. Separately, ASC Topic 450, Contingencies ("ASC 450") governs the disclosure and accrual of contingencies. ASC 450-20-55 provides examples of loss contingencies covered by ASC 450, and specifically includes "litigation, claims, and assessments." ASC 450-20-55-13 provides, that, at minimum, a loss contingency involving a filed lawsuit must be disclosed if there is at least a reasonable possibility that the outcome will be unfavorable, *i.e.*, that the chance of an unfavorable outcome is "more than remote but less than likely (ASC 450-20). ASC 450-20-55-13 further provides that, if an amount of loss cannot be reasonably estimated, or "is determined to be reasonably possible but not probable," an accrual or estimate of the loss would be inappropriate.

## VI. ALLEGATIONS RELEVANT TO THE SECURITIES ACT CLAIMS

96. Plaintiffs' claims under the Securities Act do not sound in fraud and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of his claims under the Securities Act. Any allegations of fraud, fraudulent conduct, or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Securities Act, which do not have scienter, fraudulent intent, or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

97. As alleged below, Defendants made a series of materially misleading statements or omissions of material fact in the offering materials in connection with Maison's IPO.

98. Maison's IPO was made pursuant to the IPO Registration Statement, including the final IPO Prospectus, filed with the SEC on October 5, 2023, but dated October 4, 2023. The Individual Defendants signed/or authorized the signing of the IPO Registration Statement.

99. The IPO Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation, including Items 103 and 404 of Regulation S-K, Regulation S-X, and GAAP.

### A. False And Misleading Statements And Omissions In The IPO Registration Statement Relating To Litigation

100. In the "Limitation on Liability and Indemnification Matters" section of the IPO Registration Statement discussed material ongoing litigation and represented that "***there is no pending litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought, and we are not aware of any threatened litigation that may result in claims for indemnification***."

101. In addition, Note 18, Commitments and contingencies, to the financial statements ended July 31, 2023 (unaudited) and April 30, 2023, as well as Note 17, Commitments and contingencies, to the financial statements ended April 30, 2023 and 2022, all of which were included in the IPO Registration Statement stated, in relevant part:

> The Company is otherwise periodically involved in various legal proceedings that are incidental to the conduct of its business, including, but not limited to, employment discrimination claims, customer injury claims, and investigations. When the potential liability from a matter can be estimated and the loss is considered probable, the Company records the estimated loss. Due to uncertainties related to the resolution of lawsuits, investigations, and claims, the ultimate outcome may differ from the estimates. Although the Company cannot predict with certainty the ultimate resolution of any lawsuits, investigations, and claims asserted against it, management does not believe any currently pending legal proceeding to which the Company is a party will have a material adverse effect on its financial statements.
>
> In May 2020, Maison El Monte was named as a co-defendant in a complaint filed by a consumer advocacy group alleging violations of a California health and safety regulation. The case is pending in the

> Superior Court of the State of California, and as such, the Company has not made any accruals of possible loss for the year ended April 30, 2023 related to this case.
>
> In June 2022, Maison San Gabriel entered into a confidential settlement agreement with the plaintiff in connection with a California employment law case whereby Maison San Gabriel agreed to pay $98,500 to plaintiff in full settlement of all claims in the case. As a result of the settlement agreement, the Company accrued $98,500 as a loss relating to the case for the fiscal year ended April 30, 2022. During the year ended April 30, 2023, the Company accrued additional $40,000 litigation loss. This settlement amount is subject to reduction by a court proceeding scheduled in 2023.

102. The foregoing statements emphasized above in ¶100, and the notes to the financial statements in ¶101 were materially misleading when made and omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the pendency of the Zang Action, which was filed on or about June 9, 2020. The nondisclosure of the Zang Action was material because, *inter alia*:

a. Maison's Monterey Park supermarket and certain of Defendant Xu's actions relating to Maison's supermarkets, and in particular, the Monterey Park supermarket, are key subjects of the Zang Action (¶¶63-72);

b. The Zang Action alleged that Maison's Monterey Park store is used "as a front for a scheme of immigration fraud," *inter alia* (¶¶67, 69), and Defendants admit in the IPO Registration Statement that enforcement of immigration laws was a risk to the Company that "could materially adversely affect our business, prospects, financial condition, cash flows, and results of operations";

c. The Zang plaintiff sought an accounting relating to the $500,000 investment and a share of Maison Monterey Park's profits for one of the two causes of action brought against Maison's Monterey Park supermarket (¶69);

d. In comparison, the IPO Registration Statement did disclose a previously settled employment action, in which Maison accrued a loss of just $98,500

for the year ended April 30, 2022 and an additional accrual of $40,000 for the year ended April 30, 2023 (¶101); and

e. At the time of the IPO, Maison reported "cash on hand" of $1.61 million as of July 31, 2023, meaning that the accounting sought by the Zang plaintiff were at minimum 31% of all the Company's "cash on hand." Moreover, Maison reported a working capital *deficit* of $1.44 million,[3] and a net *loss* of $104,939 attributable to the Company for the quarter ended July 31, 2023.

103. Item 103 of Regulation S-K requires that offering documents "describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject." 17 C.F.R. §229.103. Item 103 requires that the description include "the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceedings and the relief sought."

104. Here, Defendants failed to disclose the Zang Action, which was filed on or about June 9, 2020, and the pertinent details required by Item 103 of Regulation S-K in the IPO Registration Statement. This litigation is material because, *inter alia*:

a. Maison's Monterey Park supermarket and certain of Defendant Xu's actions relating to Maison's supermarkets, and in particular, the Monterey Park supermarket, are key subjects of the Zang Action (¶¶63-72);

b. The Zang Action alleged that Maison's Monterey Park store is used "as a front for a scheme of immigration fraud," inter alia (¶¶67, 69), and Defendants admit in the IPO Registration Statement that enforcement of immigration

[3] Working capital is the difference between a company's current assets and current liabilities, is a measure of a company's liquidity and short-term financial health, and indicates the ability of a company to fund operations and respond to financial stress or opportunities. A working capital deficit suggests potential liquidity issues.

laws was a risk to the Company that "could materially adversely affect our business, prospects, financial condition, cash flows, and results of operations";

c. The Zang plaintiff sought an accounting relating to the $500,000 investment and a share of Maison Monterey Park's profits for one of the two causes of action brought against Maison's Monterey Park supermarket (¶69);

d. In comparison, the IPO Registration Statement did disclose a previously settled employment action, in which Maison accrued a loss of just $98,500 for the year ended April 30, 2022 and an additional accrual of $40,000 for the year ended April 30, 2023 (¶101); and

e. At the time of the IPO, Maison reported "cash on hand" of $1.61 million as of July 31, 2023, meaning that the accounting sought by the Zang plaintiff were at minimum 31% of all the Company's "cash on hand." Moreover, Maison reported a working capital *deficit* of $1.44 million, and a net *loss* of $104,939 attributable to the Company for the quarter ended July 31, 2023.

105. In addition, the failure of the IPO Registration Statement to disclose the Zang Action violated GAAP as detailed in ¶95, *supra*.

**B. False And Misleading Statements And Omissions In The IPO Registration Statement Relating To Related Party Transactions**

106. In the "Prospectus Summary" section of the IPO Registration Statement, the Company detailed its corporate structure, and included a list of the Company's acquisitions since its founding, stating:

- ***In July 2019, the Company acquired 91% of the equity interests in Good Fortune Supermarket San Gabriel, LP, a California Limited Partnership ("Maison San Gabriel"), and 85.25% of the equity interests in Good Fortune Supermarket of Monrovia, LP ("Maison Monrovia"), each of which owns a HK Good Fortune Supermarket in San Gabriel, California and Monrovia, California, respectively.***

- In October 2019, the Company acquired 91.67% of the equity interests in Super HK of El Monte, Inc., a California Corporation

("Maison El Monte"), which owns a Hong Kong Supermarket in El Monte, California.

• In May 2021, the Company acquired 10% of the equity interests in Dai Cheong, a wholesale business which mainly supplies foods and groceries imported from Asia, which is 100% owned by Mr. John Xu. We intend to use a portion of the proceeds of this offering to acquire the remaining 90% equity interest. This transaction was treated as a related party transaction.

• In December 2021, the Company acquired 10% of the equity interests in HKGF Market of Alhambra, Inc., a California corporation, and the owner of a satellite store in Alhambra, California from Ms. Grace Xu, spouse of John Xu, our chief executive officer. We intend to acquire the remaining 90% equity interest in the Alhambra Store with a portion of the net proceeds from this offering. This transaction was treated as a related party transaction.

• On June 30, 2022, the Company acquired 100% of the equity of GF Supermarket of MP, Inc. from DNL Management Inc., which owned 51% of the equity, and Ms. Grace Xu, who owned 49% of the equity, spouse of John Xu, our chief executive officer. This acquisition was treated as a related party transaction.

107. In the "Our Business Model" section of the IPO Registration Statement, the Company detailed its history, and again listed the Company's acquisitions since its founding, stating:

• ***In July 2019, the Company acquired 91% of the equity interests in Maison San Gabriel and 85.25% of the equity interests in Maison Monrovia, each of which owns a HK Good Fortune Supermarket in San Gabriel, California and Monrovia, California, respectively.***

• In October 2019, the Company acquired 91.67% of the equity interests in Maison El Monte, which owns a Hong Kong Supermarket in El Monte, California.

• In May 2021, the Company acquired 10% of the equity interests in Dai Cheong, a wholesale business which mainly supplies foods and groceries imported from Asia, which is 100% owned by Mr. John Xu. We intend to use a portion of the proceeds of this offer to acquire the

remaining 90% equity interest. This transaction was treated as a related party transaction.

- In December 2021, the Company acquired 10% of the equity interests in HKGF Market of Alhambra, Inc., a California corporation, and the owner of the Alhambra Store, California from Ms. Grace Xu, spouse of Mr. John Xu, our chief executive officer. We intend to acquire the remaining 90% equity interest in the Alhambra Store with a portion of the net proceeds from this offering. This transaction was treated as a related party transaction.

- On June 30, 2022, the Company acquired 100% of the equity interests of GF Supermarket of MP, Inc. from DNL Management Inc. (51% ownership) and Ms. Grace Xu (49% ownership), spouse of Mr. John Xu, our chief executive officer. This acquisition was treated as a related party transaction.

108. The foregoing statements emphasized above discussing the acquisitions of Masion San Gabriel and Maison Monrovia in ¶¶106, 107 were materially misleading when made and omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, that the acquisitions were related party transactions due to Defendant Xu's affiliation with and ability to control and/or significantly influence Good Fortune San Gabriel and Good Fortune Monrovia at the time Maison acquired these equity interests.

109. The nondisclosure of these related party transactions in the emphasized statements above in ¶¶106, 107 were material because, *inter alia*:

a. Although the Company did not disclose the acquisition price for Maison San Gabriel and Maison Monrovia, these transactions concerned the acquisition of the Company's first two supermarkets—Maison's core business (¶¶42, 75, 78).

b. Although the Company did not disclose the amount of net revenues or gross profit attributable to each of its grocery stores, at the time of these statements, Maison San Gabriel and Maison Monrovia certainly materially contributed to the Company's revenues as two of just four majority-owned

supermarkets and Maison holding minority interests in only two additional stores (¶¶41-43). Indeed, the IPO Registration Statement notes that a key factor that would affect Maison's operating results includes "interruption[s] [to] the operation of our stores" displaying that each store is material to the Company.

c. In comparison, the acquisition of equity interests in smaller amounts were disclosed as related party transactions, and thus considered material, by Defendants in the IPO Registration Statement, such as selling a 25% equity interest of Hong Kong Supermarket of Monterey Park, Ltd in October 2019, and acquiring a 10% equity interest in Dai Cheong Co., Inc in May 2021, a 10% equity interest in the Alhambra store in December 2021, and a 49% equity interest in the Monterey Park store in June 2022 (*e.g.*, ¶110, *infra*).

d. Maison states that "[b]ecause we have entered into a significant number of related party transactions through the course of our routine business operations, there is a risk of conflicts of interest involving our management, and that such transactions may not reflect terms that would be available from unaffiliated third parties." Each of these related party transactions were with companies owned by either Defendant Xu or his wife. Additional transactions with parties that are under the common control of, and/or are significantly influenced by, Defendant Xu, are information that a reasonable investor would want to know.

e. From the limited information provided in the IPO Registration Statement, Maison's undisclosed related party transactions with Good Fortune San Gabriel and Good Fortune Monrovia reflected terms not available to unaffiliated third parties. The IPO Registration Statement briefly discussed the accounting and reporting of noncontrolling interests ("NCIs"), *i.e.*, not wholly owned consolidated subsidiaries, such as Maison San Gabriel and Maison Monrovia. Maison admitted that under GAAP, "losses of a partially owned consolidated subsidiary [are to] be allocated to noncontrolling interests even when such allocation might result in a

deficit balance." However, Maison's noncontrolling interest balance[4] increased in the quarter ended July 31, 2023 by $78,215 in income attributable to the noncontrolling interests. During that same quarter, Maison actually had a net *loss* of $26,724 prior to attributing the $78,215 of net income to the noncontrolling interest, which thus increased the net loss attributable to the Company for a total net loss to Maison of $104,939. As such, disclosing that the transactions with Good Fortune San Gabriel and Good Fortune Monrovia would be material to understanding Maison's financial position and operating results, which along with the noncontrolling interest in the El Monte store, almost tripled Maison's net loss for the latest financial quarter.

110. In the "Certain Relationships and Related Party Transactions" section of the IPO Registration Statement, Maison stated:

> The following includes a summary of transactions since July 2019 and any currently proposed transactions to which we were or are expected to be a participant in which any of our directors, executive officers, or holders of more than 5% of our capital stock, or any affiliate or member of the immediate family of the foregoing persons, had or will have a direct or indirect material interest. Most of these transactions are between John Xu, our majority shareholder, chairman of the board and chief executive officer, and us."
>
> • On October 29, 2019, the Company acquired a 25% equity interest of Hong Kong Supermarket of Monterey Park, Ltd for $0.66 million. On January 1, 2020, the Company sold the 25% equity interest of Hong Kong Supermarket of Monterey Park, Ltd to HZV Holding Inc. for $0.66 million, a company owned by John Xu.
>
> • In fiscal year 2020, the Company borrowed $1,863,666 at 0% interest per annum from Ideal Investment, a company owned by John Xu. As of April 30, 2020, the Company has converted all payables from Ideal Investment to shares and the balance was zero.

[4] Comprised of the 9% equity interest of Maison San Gabriel, 14.75% equity interest of Maison Monrovia, and 8.33% equity interest of Maison El Monte.

- In fiscal year 2020, the Company lent $20,000 at 0% interest per annum to Good Fortune CA3, LP, a company owned by John Xu. Good Fortune CA3, LP repaid the Company this amount in full in 2022.

- As of April 30, 2021, the Company has borrowed $86,288 at 0% interest per annum from John Xu. The Company paid back this amount in 2022.

- In fiscal year 2021, the Company lent $270,000 at 0% interest per annum to JC International Group LLC, a company owned by John Xu. JC International Group LLC repaid the Company in full in 2022.

- In fiscal year 2021, the Company lent $60,000 at 0% interest per annum to Ideal Investment, a company owned by John Xu. Ideal Investment has paid back this amount as of April 30, 2022.

- In fiscal year 2021, the Company lent $30,000 at 0% interest per annum to Ideal City Capital, a company owned by John Xu. Ideal City Capital has paid back this amount as of April 30, 2022.

- In fiscal year 2021, the Company lent $122,000 at 0% interest per annum to Fowler Development, a company owned by John Xu. Fowler Development has paid back this amount as of April 30, 2022.

- In fiscal year 2021, the Company lent $43,100 at 0% interest per annum to Good Fortune CA3, LP, a company owned by John Xu. Good Fortune CA3, LP has paid back this amount as of April 30, 2022.

- On May 1, 2021, the Company acquired a 10% equity interest of Dai Cheong Co., Inc, a California corporation, from DC Holding. DC Holding is owned by John Xu. The purchase price for this transaction was $162,665.

- As of April 30, 2022, the Company lent $20,000 at 0% interest per annum to Good Fortune CA3, LP, a company owned by John Xu, this amount was repaid on July 29, 2022.

- In fiscal year 2022, the Company borrowed $30,825 at 0% interest per annum from Ideal City Capital, a company owned by John Xu. This amount was repaid on October 19, 2022.

- In fiscal year 2022, the Company borrowed $108,361 at 0% interest per annum from JC International Group LLC, a company owned by John Xu. This amount was repaid on October 19, 2022.

- As of April 30, 2022, the Company owed John Xu $174,594. This amount was repaid on October 20, 2022.

- As of April 30, 2022, the Company owed Grace Xu $40,775. This amount was repaid on October 20, 2022.

- On December 31, 2021, the Company acquired a 10% equity interest of HKGF Market of Alhambra, Inc., the legal entity holding the Alhambra Store, from Grace Xu. The purchase price for this transaction was $40,775.

- On June 30, 2022, the Company acquired 100% of the equity of GF Supermarket of MP, Inc. from DNL Management Inc. (51% ownership) and Ms. Grace Xu (49% ownership). This acquisition was treated as a related party transaction. The purchase price for this transaction was $1.5 million. On February 21, 2023, the Company and the selling shareholders renegotiated and entered into an Amended Stock Purchase Agreement, with an effective date on October 31, 2022, to amend the purchase price to $2.5 million, which both parties believed reflected the true fair value of Maison Monterey Park.

111. The IPO Registration Statement also included Maison's financial statements for the financial periods ended July 31, 2023 (unaudited) and April 30, 2023, as well as for the fiscal year ended April 30, 2023 and 2022. Note 13 to the financial statements ended July 31, 2023 (unaudited) and April 30, 2023, and Note 12 to the financial statements ended April 30, 2023 and 2022, both listed the related party transactions and balances for these financial periods.

112. The foregoing statements above in ¶110 and the notes to the financial statements in ¶111 omitted to state material facts necessary to make the statements not misleading, because they failed to include, *inter alia*, the following related party transactions and balances:

a. In July 2019, Maison acquired 91% of the equity interests in Good Fortune Supermarket of San Gabriel, LP, an entity affiliated with Defendant Xu and which he had control over.

b. In July 2019, Maison 85.25% of the equity interests in Good Fortune Supermarket of Monrovia, LP, an entity affiliated with Defendant Xu and which he had control over.

113. The nondisclosure of these related party transactions in the statements above in ¶110 and the notes to the financial statements in ¶111 were material because, *inter alia*:

a. Although the Company did not disclose the acquisition price for Maison San Gabriel and Maison Monrovia, these transactions concerned the acquisition of the Company's first two supermarkets—Maison's core business (¶¶42, 75, 78).

b. Although the Company did not disclose the amount of net revenues or gross profit attributable to each of its grocery stores, at the time of these statements, Maison San Gabriel and Maison Monrovia certainly materially contributed to the Company's revenues as two of just four majority-owned supermarkets and Maison holding minority interests in only two additional stores (¶¶41-43). Indeed, the IPO Registration Statement notes that a key factor that would affect Maison's operating results includes "interruption[s] [to] the operation of our stores" displaying that each store is material to the Company.

c. In comparison, the acquisition of equity interests in smaller amounts were disclosed as related party transactions, and thus considered material, by Defendants in the IPO Registration Statement, such as selling a 25% equity interest of Hong Kong Supermarket of Monterey Park, Ltd in October 2019, and acquiring a 10% equity interest in Dai Cheong Co., Inc in May 2021, a 10% equity interest in the Alhambra store in December 2021, and a 49% equity interest in the Monterey Park store in June 2022 (*e.g.*, ¶110).

d. Moreover, Maison states that "[b]ecause we have entered into a significant number of related party transactions through the course of our routine business operations, there is a risk of conflicts of interest involving our management,

and that such transactions may not reflect terms that would be available from unaffiliated third parties." Each of these related party transactions were with companies owned by either Defendant Xu or his wife. Additional transactions with parties that are under the common control of, and/or are significantly influenced by, Defendant Xu, are information that a reasonable investor would want to know.

e. From the limited information provided in the IPO Registration Statement, Maison's undisclosed related party transactions with Good Fortune San Gabriel and Good Fortune Monrovia reflected terms not available to unaffiliated third parties. The IPO Registration Statement briefly discussed the accounting and reporting of noncontrolling interests ("NCIs"), *i.e.*, not wholly owned consolidated subsidiaries, such as Maison San Gabriel and Maison Monrovia. Maison admitted that under GAAP, "losses of a partially owned consolidated subsidiary [are to] be allocated to noncontrolling interests even when such allocation might result in a deficit balance." However, Maison's noncontrolling interest balance increased in the quarter ended July 31, 2023 by $78,215 in income attributable to the noncontrolling interests. During that same quarter, Maison actually had a net *loss* of $26,724 prior to attributing the $78,215 of net income to the noncontrolling interest, which thus increased the net loss attributable to the Company for a total net loss to Maison of $104,939. As such, disclosing that the transactions with Good Fortune San Gabriel and Good Fortune Monrovia would be material to understanding Maison's financial position and operating results, which along with the noncontrolling interest in the El Monte store, almost tripled Maison's net loss for the latest financial quarter.

114. In addition, the failure of the IPO Registration Statement to list the related party transactions and balances with Good Fortune Supermarket of San Gabriel, LP and Good Fortune Supermarket of Monrovia, LP violated SEC Regulations, GAAP, and the Company's own accounting policies as detailed in Section V.H, *supra.*

## VII. ALLEGATIONS RELEVANT TO THE EXCHANGE ACT CLAIMS

115. During the Class Period, Maison, Xu, and Lopez made materially false and/or misleading statements and omissions of material fact to investors in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

116. Each of the statements and omissions identified below (in Section VII.A) as false and/or misleading was made with scienter because Maison, Xu, and Lopez knew and/or recklessly disregarded that their statements were false and/or misleading and/or omitted material information required to be stated therein to make their statements not misleading.

117. The allegations in this Exchange Act section apply only to claims under the Securities Exchange Act of 1934 and are not alleged in respect of any of Plaintiffs' Securities Act claims.

### A. False And Misleading Statements And Omissions Issued During the Class Period

#### 1. False And Misleading Statements And Omissions In Maison's IPO Registration Statement

118. The Class Period begins on October 5, 2023. On that day, Maison's common stock began publicly trading pursuant to the IPO Registration Statement. In the "Limitation on Liability and Indemnification Matters" section of the IPO Registration Statement discussed material ongoing litigation and represented that "***there is no pending litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought, and we are not aware of any threatened litigation that may result in claims for indemnification***."

119. In addition, in Note 18, Commitments and contingencies, to the financial statements ended July 31, 2023 (unaudited) and April 30, 2023, as well as Note 17, Commitments and contingencies, to the financial statements ended April 30, 2023 and

2022, all of which were included in the IPO Registration Statement stated, in relevant part:

> The Company is otherwise periodically involved in various legal proceedings that are incidental to the conduct of its business, including, but not limited to, employment discrimination claims, customer injury claims, and investigations. When the potential liability from a matter can be estimated and the loss is considered probable, the Company records the estimated loss. Due to uncertainties related to the resolution of lawsuits, investigations, and claims, the ultimate outcome may differ from the estimates. Although the Company cannot predict with certainty the ultimate resolution of any lawsuits, investigations, and claims asserted against it, management does not believe any currently pending legal proceeding to which the Company is a party will have a material adverse effect on its financial statements.
>
> In May 2020, Maison El Monte was named as a co-defendant in a complaint filed by a consumer advocacy group alleging violations of a California health and safety regulation. The case is pending in the Superior Court of the State of California, and as such, the Company has not made any accruals of possible loss for the year ended April 30, 2023 related to this case.
>
> In June 2022, Maison San Gabriel entered into a confidential settlement agreement with the plaintiff in connection with a California employment law case whereby Maison San Gabriel agreed to pay $98,500 to plaintiff in full settlement of all claims in the case. As a result of the settlement agreement, the Company accrued $98,500 as a loss relating to the case for the fiscal year ended April 30, 2022. During the year ended April 30, 2023, the Company accrued additional $40,000 litigation loss. This settlement amount is subject to reduction by a court proceeding scheduled in 2023.

120. The foregoing statements emphasized above in ¶118, and the notes to the financial statements in ¶119 were materially misleading when made and omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the pendency of the Zang Action, which was filed on or about June 9, 2020. The nondisclosure of the Zang Action was material because, *inter alia*:

a. Maison's Monterey Park supermarket and certain of Defendant Xu's actions relating to Maison's supermarkets, and in particular, the Monterey Park supermarket, are key subjects of the Zang Action (¶¶63-72);

b. The Zang Action alleged that Maison's Monterey Park store is used "as a front for a scheme of immigration fraud," *inter alia* (¶¶67, 69), and Defendants admit in the IPO Registration Statement that enforcement of immigration laws was a risk to the Company that "could materially adversely affect our business, prospects, financial condition, cash flows, and results of operations";

c. The Zang plaintiff sought an accounting relating to the $500,000 investment, and a share of Maison Monterey Park's profits for one of the two causes of action brought against Maison's Monterey Park supermarket (¶69);

d. In comparison, the IPO Registration Statement did disclose a previously settled employment action, in which Maison accrued a loss of just $98,500 for the year ended April 30, 2022 and an additional accrual of $40,000 for the year ended April 30, 2023 (¶119); and

e. At the time of the IPO, Maison reported "cash on hand" of $1.61 million as of July 31, 2023, meaning that the damages sought by the Zang plaintiff were at minimum 31% of all the Company's "cash on hand." Moreover, Maison reported a working capital *deficit* of $1.44 million, and a net *loss* of $104,939 attributable to the Company for the quarter ended July 31, 2023.

121. In addition, the failure of the IPO Registration Statement to disclose the Zang Action violated GAAP as detailed in ¶95, *supra.*

**2. False And Misleading Statements And Omissions In Maison's Selling Shareholders Registration Statement**

122. On November 29, 2023, the Company filed a registration statement on Form S-1 for the sale of up to 1,190,476 shares of Class A common stock by certain selling shareholders from time to time, and which declared effective by the SEC December 6, 2023. On December 11, 2023, Maison filed with the SEC the prospectus

dated December 6, 2023 (the "Selling Shareholders Prospectus"), which forms part of the registration statement (the Selling Shareholders Prospectus and the Form S-1 together are collectively referred to as the "Selling Shareholders Registration Statement"). Defendants Xu and Lopez signed or authorized the signing of the Selling Shareholders Registration Statement. In the "Limitation on Liability and Indemnification Matters" section of the Selling Shareholders Registration Statement discussed material ongoing litigation and represented that "***there is no pending litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought, and we are not aware of any threatened litigation that may result in claims for indemnification***."

123. In addition, Note 18, Commitments and contingencies, to the financial statements ended July 31, 2023 (unaudited) and April 30, 2023, as well as Note 17, Commitments and contingencies, to the financial statements ended April 30, 2023 and 2022, all of which were included in the Selling Shareholders Registration Statement stated, in relevant part:

> The Company is otherwise periodically involved in various legal proceedings that are incidental to the conduct of its business, including, but not limited to, employment discrimination claims, customer injury claims, and investigations. When the potential liability from a matter can be estimated and the loss is considered probable, the Company records the estimated loss. Due to uncertainties related to the resolution of lawsuits, investigations, and claims, the ultimate outcome may differ from the estimates. Although the Company cannot predict with certainty the ultimate resolution of any lawsuits, investigations, and claims asserted against it, management does not believe any currently pending legal proceeding to which the Company is a party will have a material adverse effect on its financial statements.
>
> In May 2020, Maison El Monte was named as a co-defendant in a complaint filed by a consumer advocacy group alleging violations of a California health and safety regulation. The case is pending in the Superior Court of the State of California, and as such, the Company has not made any accruals of possible loss for the year ended April 30, 2023 related to this case.

> In June 2022, Maison San Gabriel entered into a confidential settlement agreement with the plaintiff in connection with a California employment law case whereby Maison San Gabriel agreed to pay $98,500 to plaintiff in full settlement of all claims in the case. As a result of the settlement agreement, the Company accrued $98,500 as a loss relating to the case for the fiscal year ended April 30, 2022. During the year ended April 30, 2023, the Company accrued additional $40,000 litigation loss. This settlement amount is subject to reduction by a court proceeding scheduled in 2023.

124. The foregoing statements emphasized above in ¶122, and the notes to the financial statements in ¶123 were materially misleading when made and omitted to state material facts necessary to make the statements not misleading, because they failed to disclose, among other things, the pendency of the Zang Action, which was filed on or about June 9, 2020. The nondisclosure of the Zang Action was material because, *inter alia*:

a. Maison's Monterey Park supermarket and certain of Defendant Xu's actions relating to Maison's supermarkets, and in particular, the Monterey Park supermarket, are key subjects of the Zang Action (¶¶63-72);

b. The Zang Action alleged that Maison's Monterey Park store is used "as a front for a scheme of immigration fraud," *inter alia* (¶¶67, 69), and Defendants admit in the Selling Shareholders Registration Statement that enforcement of immigration laws was a risk to the Company that "could materially adversely affect our business, prospects, financial condition, cash flows, and results of operations";

c. The Zang plaintiff sought an accounting relating to the $500,000 investment, and a share of Maison Monterey Park's profits for one of the two causes of action brought against Maison's Monterey Park supermarket (¶69);

d. In comparison, the Selling Shareholders Registration Statement did disclose a previously settled employment action, in which Maison accrued a loss

of just $98,500 for the year ended April 30, 2022 and an additional accrual of $40,000 for the year ended April 30, 2023 (¶123); and

e. In the Selling Shareholder's Registration Statement, Maison reported "cash on hand" of $1.61 million as of July 31, 2023, meaning that the damages sought by the Zang plaintiff were at minimum 31% of all the Company's "cash on hand." Moreover, Maison reported a working capital *deficit* of $1.44 million, and a net *loss* of $104,939 attributable to the Company for the quarter ended July 31, 2023.

125. In addition, the failure of the Selling Shareholders Registration Statement to disclose the Zang Action violated GAAP as detailed in ¶95, *supra.*

**B. Loss Causation**

126. Maison, Xu, and Lopez's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

127. During the Class Period, Plaintiffs and the Class purchased shares of Maison Class A common stock at artificially inflated prices and were damaged thereby. The price of the Company's shares of Class A common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

128. Artificial inflation in Maison's stock price was removed when concealed risks materialized and/or the truth about the material misrepresentations and omissions was revealed to the public on December 15, 2023. As a direct result of this disclosure, the price of Maison's publicly traded common stock declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

129. On December 15, 2023, Hindenburg posted the results of their investigation into Maison, concluding that they "found multiple red flags" with the

Company, including that that Defendant Xu and his J&C business used the Hong Kong Supermarkets "as a front to defraud the EB-5 visa program."

130. Following this news, the price of Maison's Class A common stock fell 83.6%, or $12.71 per share, to close at just $2.50 per share on December 15, 2023, on unusually heavy trading volume.

### C. Additional Allegations Regarding Defendants' Scienter

#### 1. Defendants' Knowledge Of The Zang Action, Its Serious Allegations Of Immigration Fraud, And Its Admitted Material Risk To The Company And Its Business Prospects

131. As alleged herein, defendants Maison, Xu, and Lopez acted with scienter because they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, including, *inter alia*, Sections V.D, F, H, *supra*, Xu and Lopez, by virtue of their receipt of information reflecting the true facts regarding Maison, their control over, and/or receipt and/or modification of Maison's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Maison.

132. Defendants Maison, Xu, and Lopez knew, or were deliberately reckless in not knowing, of the pendency of the Zang Action and its serious allegations of immigration fraud. Indeed, Defendant Xu was also a named defendant in the Zang Action, as was the Hong Kong Supermarket in Monterey Park, one of just four supermarkets in which Maison owned a majority or whole interest. In addition, certain other businesses of Defendant Xu's were also named a defendant in the Zang Action, including J&C and HZV Holding, Inc. Moreover, Defendant Lopez, having

worked closely with Defendant Xu for more than a decade and serving concurrently as the CFO of Maison, J&C, and HZV Holding, Inc. would have known of the pendency of the Zang Action, or was otherwise deliberately reckless in not knowing.

133. Despite knowing of the pendency of the Zang Action throughout the Class Period, defendants Maison, Xu, and Lopez did not want to alert investors to the lawsuit due its serious allegations of immigration fraud. Zang alleges that the Hong Kong Supermarket in Monterey Park is used "as a front for a scheme of immigration fraud, and as the spurious work location of other purported 'managers' and 'executives' on whose behalf Defendants are preparing and submitting documents to defraud USCIS." Ex. 1 at ¶40. The lawsuit also alleges that the Hong Kong Supermarket in Monterey Park's "business was based on false, misleading and deception tactics, including but not limited to, allowing other Defendants to use its name and goodwill to entice Chinese immigrants…for their fraudulent 'investment for green card' scheme; and allowing other Defendants access to its facilities and office spaces for the purpose of creating sham employment in furtherance of Defendants' fraudulent immigration petitions to USCIS." *Id.* at ¶111. Indeed, disclosing these allegations would have both called Defendants Xu and Lopez's credibility into serious question, and would have exposed material legal risks that Maison was facing.

134. Defendants Maison, Xu, and Lopez admit in both the IPO and Selling Shareholders Registration Statements that "enforcement of immigration laws" is a risk that "could materially adversely affect our business, prospects, financial condition, cash flows, and results of operations," and further explain that "if any of our workers are found to be unauthorized [according to immigration laws, regulations, or programs] we could experience adverse publicity that negatively impacts our brand[,]" as well as subjecting Maison to "fines or civil or criminal penalties[.]" Disclosing to investors that one of its few stores and CEO were involved in an immigration fraud scheme would certainly alert investors to a material risk in

investing in the Company, and also could seriously damage the Company's reputation, which Defendants repeatedly admitted in the IPO and Selling Shareholders Registration Statements would materially adversely affect the Company.

135. Moreover, the Zang Action alleges that "Defendant Xu is affiliated with 51 business entities with 21 of these companies located at the same address as J&C International[,]" and that many of these businesses are "fake companies and sham corporations for the purpose of obtaining work visa and green card for J&C International's victims." Ex. 1 at ¶¶62, 65.[5] Defendants also admitted in the IPO and Selling Shareholders Registration Statements that Maison is dependent on Defendant Xu, and that he is "integral" to the Company's brand, culture, and reputation. Allegations of Maison's store being used by Defendant Xu as part of an immigration fraud scheme would certainly have a material negative affect on the Company's reputation, and because, as Defendants admit, Defendant Xu has "substantial control" over Maison and "will maintain the ability to control" the Company, there was little

---

[5] The shell entities at issue in the Zang Action, HZV Holding, Inc. and ZHL Management, reflect such a conclusion. Maison admits that HZV Holding, Inc. is owned by Defendant Xu, and Defendant Lopez held herself out as HZV's CFO. *See* Ex. 1 at Ex. D. However, HZV's filings with the California Secretary of State list a different individual, Jianqing Gu, as its CEO, Secretary, CFO, Director, and agent. These filings also list HZV's corporate and service address as 19745 Colima Rd #1-616, Rowland Heights, CA 91748—J&C's current headquarters according to its website, and later as 127 N Garfield Ave, Monterey Park, California 91754—the same address as Maison's principal executive offices. *See, e.g.*, Ex. 3 at 8-10. A review of Google maps shows that 19745 Colima Rd #1-616, Rowland Heights, CA 91748 is a The UPS Store within a shopping center in Rowland Heights, which according to their website (https://locations.theupsstore.com/ca/rowland-heights/19745-e-colima-rd) offers mailbox services. Filings with the California Secretary of State list ZHL Management Inc's address first as 17700 Castleton St, Ste. 128, City of Industry, CA 91748—the same address as J&C's former principal offices, and later as 19745 Colima Rd #1-616, Rowland Heights, CA 91748—J&C's current headquarters according to its website, a The UPS Store. Ex. 3 at 11-15.

to nothing the Company, its other executives, and its directors could do stop Defendant Xu's use of its stores to further immigration fraud.

**2. Corporate Scienter Allegations**

136. The Company is liable for the acts of Defendants Xu and Lopez and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

137. The scienter of Defendants Xu and Lopez and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

138. Aside from the scienter of Defendants Xu and Lopez, the facts alleged herein raise a strong inference of corporate scienter as to Maison as an entity. Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading. Here, the statements alleged were made to the investing public regarding the Company's operations, finances, and business practices—all important topics that would necessarily require approval by appropriate corporate officers.

**D. Applicability Of The Presumption Of Reliance (Fraud-On-The-Market Doctrine)**

139. The market for Maison's Class A common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Maison's shares of Class A common stock traded at artificially inflated prices during the Class Period. On December 14, 2023, the Company's share price closed at a Class Period high of $15.21 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's Class A common stock relying upon the integrity of the market price of

these shares and market information relating to Maison and have been damaged thereby.

140. During the Class Period, the artificial inflation of Maison's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Maison, Xu, and Lopez made or caused to be made a series of materially false and/or misleading statements about Maison's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Maison and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Maison, Xu, and Lopez's materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

141. At all relevant times, the market for Maison's shares of Class A common stock was an efficient market for the following reasons, among others:

a. Maison shares of Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, Maison filed periodic public reports with the SEC and/or the NASDAQ;

c. Maison regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d. The average daily trading volume for Maison shares of Class A common stock during the Class Period was approximately 1,111,797 shares with more than 17.45 million shares of Class A common stock outstanding as of December 14, 2023, and a market capitalization reaching $247.31 million during the Class Period.

142. As a result of the foregoing, the market for Maison's shares of Class A common stock promptly digested current information regarding Maison from all publicly available sources and reflected such information in Maison's share price. Under these circumstances, all purchasers of Maison's common stock during the Class Period suffered similar injury through their purchase of Maison's shares at artificially inflated prices and a presumption of reliance applies.

143. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VIII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

144. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

145. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

146. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Maison who knew that the statement was false when made.

## IX. CLAIMS FOR RELIEF

### COUNT I
### Violation Of Section 11 Of The Securities Act
### In Connection With the IPO Against All Defendants

147. Plaintiffs repeat and re-allege the foregoing allegations in ¶¶1-27, 30-114, 144-146. None of the preceding allegations in the Complaint in ¶¶28-29, 115-143 that are set forth in the Class's claims under Sections 10(b) and 20(a) of the Exchange Act apply to these Securities Act claims.

148. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. The defendants named in this Count are responsible for the contents and dissemination of the IPO Registration Statement; signed the IPO Registration Statement; and/or were senior employees, directors, or underwriters who are appropriate defendants in this Count. Plaintiffs do not claim that any of the defendants named in this Count engaged in intentional or reckless misconduct or acted with fraudulent intent.

149. The IPO Registration Statement was materially false and/or misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and/or omitted to state material facts required to be stated therein.

150. This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who purchased or acquired shares of Maison Class A common stock pursuant to and/or traceable to the Company's IPO. Each Class Member with claims under this Count acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the IPO Registration Statement.

151. Maison is the issuer of the shares of Class A common stock through the IPO Registration Statement. As an issuer of securities to the public, Maison is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

152. The Individual Defendants each signed the IPO Registration Statement either personally or through an attorney-in-fact and/or caused its issuance. Each of the Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the IPO Registration Statement. They had a duty to ensure that such statements were true and correct, that there were no omissions of material fact that would make the statements misleading, and that the IPO Registration Statement contained all facts required to be stated therein. By virtue of the Individual Defendants' failure to exercise reasonable care, the IPO Registration Statement contained material misstatements and/or omissions of material facts. Accordingly, the Individual Defendants are strictly liable to Plaintiffs and the Class.

153. Each of the Underwriter Defendants owed to the holders of the shares obtained through the IPO Registration Statement the duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the IPO Registration Statement. They had a duty to ensure that such statements were true and correct, that there were no omissions of material fact that would make the

statements misleading, and that the IPO Registration Statement contained all facts required to be stated therein. By virtue of the Underwriter Defendants' failure to exercise reasonable care, the IPO Registration Statement contained material misstatements and/or omissions of material facts. Accordingly, the Underwriter Defendants are strictly liable to Plaintiffs and the Class.

154. The defendants named in this Count were responsible for the contents and dissemination of the IPO Registration Statement. None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement were true or that there was no omission of material facts necessary to make the statements made therein not misleading or that there was no omission of facts required to be stated therein.

155. The defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the IPO Registration Statement, which misrepresented or failed to disclose, among other things, the facts set forth above. By reason of the conduct alleged herein, the above-named defendants in this Count violated and/or controlled a person who violated Section 11 of the Securities Act.

156. At the times they obtained their shares of Maison Class A common stock, Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

157. This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO Registration Statement should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

158. By reason of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

**COUNT II**
**Violation Of Section 15 Of The Securities Act**
**In Connection With The IPO Against**
**The Individual Defendants**

159. Plaintiffs repeat and re-allege the foregoing allegations in ¶¶1-27, 30-114, 144-146. None of the preceding allegations in the Complaint in ¶¶28-29, 115-143 that are set forth in the Class's claims under Sections 10(b) and 20(a) of the Exchange Act apply to these Securities Act claims.

160. This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against all the Individual Defendants. Plaintiffs do not claim that any of the defendants named in this Count engaged in intentional or reckless misconduct or acted with fraudulent intent.

161. The Individual Defendants were controlling persons of Maison by virtue of their positions as senior officers and/or directors of Maison and their ability to cause the Company to arrange and execute the IPO and disseminate the IPO Registration Statement in connection therewith. Defendant Xu was also a controlling person of Maison by virtue of his status as controlling shareholder.

162. The Individual Defendants were in positions to control and did control, the false and misleading statements and omissions contained in the IPO Registration Statement.

163. None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

164. Plaintiffs and the Class have sustained damages. The value of the shares of Maison Class A common stock has declined substantially due to the Securities Act violations alleged herein.

165. By reason of the above conduct, for which Maison is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as Maison pursuant to Section 15 of the Securities Act.

166. The Individual Defendants were culpable participants in the violations of Sections 11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the IPO Registration Statement and/or having otherwise participated in the process which allowed the IPO to be successfully completed.

167. This claim is brought within one year after discovery of the untrue statements and/or omissions in the IPO Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the IPO. It is therefore timely.

**COUNT III**
**Violation Of Section 10(b) Of The Exchange Act**
**And Rule 10b-5 Promulgated thereunder Against**
**Defendants Maison, Xu, And Lopez**

168. Plaintiffs repeat and re-allege the foregoing allegations in ¶¶1-29, 41-73, 95, 115-146. None of the preceding allegations in the Complaint in ¶¶30-40, 74-94, 96-114 that are set forth in the Class's claims under the Securities Act claims apply to these Exchange Act claims.

169. During the Class Period, Maison, Xu, and Lopez carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Maison's shares of Class A common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Maison, Xu, and Lopez, and each defendant, took the actions set forth herein.

170. Maison, Xu, and Lopez (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class A common stock in an effort to maintain artificially high market prices for Maison's Class A common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Maison, Xu, and Lopez are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

171. Maison, Xu, and Lopez, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Maison's financial well-being and prospects, as specified herein.

172. Maison, Xu, and Lopez employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Maison's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Maison's and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Class A common stock during the Class Period.

173. Xu and Lopez's primary liability and controlling person liability arises from the following facts: (i) Xu and Lopez were high-level executives and/or directors at the Company during the Class Period and members of the Company's management

team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

174. Maison, Xu, and Lopez had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Maison's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misrepresentations and/or omissions of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

175. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Maison's Class A common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading

statements made by Maison, Xu, and Lopez, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Maison, Xu, and Lopez, but not disclosed in public statements by Maison, Xu, and Lopez during the Class Period, Plaintiffs and the other members of the Class acquired Maison's Class A common stock during the Class Period at artificially high prices and were damaged thereby.

176. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Zang lawsuit, which was not disclosed by Maison, Xu, and Lopez, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Maison Class A common stock, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

177. By virtue of the foregoing, Maison, Xu, and Lopez violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178. As a direct and proximate result of Maison's, Xu's, and Lopez's wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**COUNT IV**
**Violation Of Section 20(a) Of The Exchange Act**
**Against Defendants Xu And Lopez**

179. Plaintiffs repeat and re-allege the foregoing allegations in ¶¶1-29, 41-73, 95, 115-146. None of the preceding allegations in the Complaint in ¶¶30-40, 74-94, 96-114 that are set forth in the Class's claims under the Securities Act claims apply to these Exchange Act claims.

180. Defendants Xu and Lopez acted as controlling persons of Maison within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Xu and Lopez had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading. Defendants Xu and Lopez were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

181. In particular, Defendants Xu and Lopez had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

182. As set forth above, Maison, Xu and Lopez each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Defendants Xu and Lopez are liable pursuant to Section 20(a) of the Exchange Act.

183. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XI. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: October 21, 2025

**GLANCY PRONGAY & MURRAY LLP**

By: */s/ Leanne H. Solish*
Robert V. Prongay
Leanne H. Solish
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
lsolish@glancylaw.com

*Counsel for Lead Plaintiffs and Lead Counsel*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Lead Plaintiffs*

**PROOF OF SERVICE**

I hereby certify that on this 21st day of October, 2025, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*s/ Leanne H. Solish*
Leanne H. Solish